# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Sidney I. Schenkier | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 04 C 522 | **DATE** | 7/6/2004 |
| **CASE TITLE** | Pickett vs. Barnhart | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
☐ FRCP4(m)  ☐ Local Rule 41.1  ☐ FRCP41(a)(1)  ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] The Commissioner's motion for summary judgment (doc # 20) is denied. The plaintiff's motion for summary judgment (doc # 18) is granted. The Court reverses and remands this case to the Commissioner for further proceedings consistent with this opinion, pursuant to sentence four of 42 U.S.C. §405(g).

(11) ■ [For further detail see order attached to the original minute order.]

| | No notices required, advised in open court. | | |
|---|---|---|---|
| | No notices required. | number of notices | **Document Number** |
| ✓ | Notices mailed by judge's staff. | JUL 0 7 2004 | 26 |
| | Notified counsel by telephone. | date docketed | |
| | Docketing to mail notices. | | |
| | Mail AO 450 form. | docketing deputy initials | |
| | Copy to judge/magistrate judge. | | |
| mm | courtroom deputy's initials | date mailed notice | |

CLERK, U.S. DISTRICT COURT

2004 JUL -6 PM 2: 05

Date/time received in central Clerk's Office    mailing deputy initials

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

DOCKETED
JUL 07 2004

ROSA PICKETT, )
      Plaintiff, )
      vs. )
       )
JO ANNE B. BARNHART, )
Commissioner of Social Security, )
      Defendant. )

No. 04 C 522
Sidney I. Schenkier,
Magistrate Judge

## MEMORANDUM OPINION AND ORDER[1]

The plaintiff, Rosa Pickett, brings this action pursuant to 42 U.S.C. § 405(g) to review a final

decision of the Commissioner ("Commissioner") of the Social Security Administration ("Agency")

denying her Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI") under

the Social Security Act ("Act"). Ms. Pickett filed an application for DIB and SSI on August 22,

2001, with a protective filing date of July 31, 2001 (Administrative Record ("R.") at 14, 80-82, 265-

267). Ms. Pickett alleged that she became disabled on January 24, 2001, due to bilateral carpal

tunnel syndrome, asthma, numbness in her hands, and chest pain (R. 76-79). Her application was

denied at the initial levels of administrative review (R. 76-79, 268-69), and she requested an

administrative hearing (R. 39-40). On April 15, 2003, an administrative law judge ("ALJ")

conducted a hearing at which Ms. Pickett, represented by counsel, appeared and testified (R. 41-75).

In addition, Elizabeth Clem testified as a vocational expert (R. 69-73). In a decision dated October

24, 2003, the ALJ found that Ms. Pickett was not disabled because she retained the ability to perform

---

[1]On April 2, 2004, by consent of the parties, this case was reassigned to Magistrate Judge Edward A. Bobrick for all proceedings including the entry of final judgment, pursuant to 28 U.S.C. § 636(c) and Local Rule 73.1 (Docs. # 14-17). By Order of the Executive Committee dated June 15, 2004, this case was then reassigned to this Magistrate Judge pursuant to Local Rule 40.1(f), following Judge Bobrick's retirement from the bench (Doc. # 24).



her past work as either a nurse's aid or a packager in a greeting card factory (R. 14-20). This became the final decision of the Commissioner when the Appeals Council denied Ms. Pickett's request for review of the decision on June 12, 2003 (R. 4-5).

Ms. Pickett now seeks summary judgment reversing the Commissioner's decision denying her DIB and SSI or, in the alternative, remanding the case for further proceedings (Doc. # 18). The Commissioner has filed a cross-motion for summary judgment to affirm her decision below (Doc. # 20). For the reasons stated below, the Court grants Ms. Pickett's motion for summary judgment and, remands the case for further proceedings; the Court denies the Commissioner's motion for summary judgment.

## I.

Ms. Pickett was born on January 30, 1961, making her forty-two years old at the time of the ALJ's decision (R. 80). She is single and has two children (R. 49). She is right-handed (R. 57), is 5' 9" tall, and weighs 245 pounds (R. 50, 185). Ms. Pickett attended school through the eleventh grade, and was in some special education classes (R. 23). She later obtained a nurse's assistant certificate after completing a vocational school course (R. 49-50). From the year 2000 through 2001, Ms. Pickett worked in a greeting card factory, where she performed various jobs among several departments, including packaging greeting cards and driving a forklift (R. 70, 118). She has briefly held several other similar factory jobs, as well as a few other short-lived positions (R. 45-47,118). In addition, Ms. Pickett worked as a certified nurse's assistant – the position she held the longest – at a mental health facility, from 1993 until 1996 (R. 71, 118). She traces the onset of her disability

to January of 2001 when, in addition to her carpal tunnel syndrome, she "started having problems with everything" (R. 47-48).[2]

## A.

The relevant medical record in this case begins on January 24, 2001, when Ms. Pickett was hospitalized at the Baptist Memorial Hospital in Osceola, Arkansas, for two days with complaints of chest pains (R. 198). There is apparently no record of this hospitalization, but shortly thereafter, on February 6, 2001, Ms. Pickett followed up with Dr. D.V. Patel at the Northeast Arkansas Clinic, and related her experience (*Id.*). The pains were sharp, and radiated from the left side of her chest to her left arm and back (*Id.*). Ms. Pickett also experienced shortness of breath, diaphoresis, and nausea (*Id.*). She was treated with aspirin, and it took two to three hours for the pain to subside (*Id.*).

Ms. Pickett told Dr. Patel that she was in constant pain (*Id.*). At that time, she was taking Celebrex for osteoarthritis, and Propo-N/APAP and Tylenol as needed for pain (*Id.*). Ms. Pickett stated she had asthma, but smoked four or five cigarettes a day (*Id.*). She complained of joint pain and depression (R. 199). An EKG showed normal sinus rhythm, but also demonstrated anterolateral ischemia (*Id.*).[3] Dr. Patel diagnosed asthma, and chest pain of questionable etiology (R. 200). On Dr. Patel's recommendation, Ms. Pickett underwent a stress echocardiagram the following day with normal results, and demonstrated a fair exercise tolerance (R. 196).

On March 7, 2001, Ms. Pickett underwent a nerve conduction study of her upper extremities at the Northeast Arkansas Clinic (R. 194-95). The results were consistent with mild carpal tunnel

---

[2]Ms. Pickett has previously sought disability benefits, unsuccessfully, in 1988; 1989; 1990; and 1994 (R. 14).

[3]Ischemia is a deficiency of blood flow (in this instance, to the heart muscle) due to the constriction of the coronary arteries. DORLAND'S ILLUSTRATED MEDICAL DICTIONARY, at 861 (28th ed. 1994).

syndrome bilaterally (R. 195). On March 21, 2001, Ms. Pickett was told she could return to work at the greeting card factory by March 26, but was instructed to wear braces on both wrists (R. 162). On March 23, however, she was noted to have limited repetitive use of both hands (*Id.*). The following week, Ms. Pickett returned to the clinic to inquire about carpal tunnel surgery, and she was referred for an orthopedic evaluation (*Id.*).

On April 3, 2001, Dr. James Marvel evaluated Ms. Pickett's carpal tunnel syndrome at the clinic (R. 167). Ms. Pickett reported that she had been unable to work from January 24 through March 26, 2001 (*Id.*). Dr. Marvel characterized the results of the nerve conduction study as revealing bilateral carpal tunnel syndrome, which was "quite mild" on the left side (*Id.*). He noted that Ms. Pickett was taking Celebrex, Tylenol with codeine, Prevacid for stomach acid, and using an Albuterol inhaler for asthma (*Id.*). Upon examination, Dr. Marvel found that clinical signs were positive for carpal tunnel syndrome on the right side (R. 168). In addition, there was tightness in the muscles on the left side of the base of Ms. Pickett's neck (*Id.*). He recommended physical therapy for this, and carpal tunnel release surgery for Ms. Pickett's right hand (*Id.*). Ms. Pickett also had a chest x-ray at the clinic that day, the results of which were consistent with asthma or bronchitis (R. 153).

Ms. Pickett underwent carpal tunnel release surgery on her right hand on April 19, 2001 (R. 147). By April 26, she reported that her right hand was feeling much better (R. 165). Her right hand continued to heal well and, while not at full strength, it was making progress through July 9, 2001 (R. 160-61, 163-64). At that time, Dr. Marvel noted that Ms. Pickett's right hand was "doing fine," but felt she had become a candidate for carpal tunnel release surgery on her left hand (R. 160). The doctor next saw Ms. Pickett on July 16, 2001, at which time he found her surgical scar was well-

4

healed (R. 145). As for her left hand, Dr. Marvel reported that there was good thenar[4] strength, although clinical signs were mildly positive for carpal tunnel syndrome (R. 145).

Ms. Pickett had carpal tunnel release surgery on her left hand on July 27, 2001 (R. 142-43). On August 16, 2001, Dr. Marvel reported that Ms. Pickett's left hand had healed, but that she had decreased sensory function in the ulnar side of her right hand (R. 158). This additional problem involved a different nerve than the one that had been freed by the surgery (*Id.*). By September 28, 2001, the doctor felt Ms. Pickett's hands were "doing relatively well" (R. 181). There continued to be decreased ulnar nerve sensation in her right hand, however, and Dr. Marvel thought she might benefit from ulnar nerve surgery (*Id.*).

In connection with Ms. Pickett's August 21, 2001 application for DIB and SSI, a state disability agency physician reviewed the preceding medical records and, on October 5, 2001, found that Ms. Pickett could occasionally lift or carry up to fifty pounds, frequently lift or carry up to twenty-five pounds, stand or walk about six hours of an eight-hour workday, sit about six hours of an eight-hour workday, and push or pull hand or foot controls without limitation (R. 173-78). On December 12, 2001, a second state disability agency physician conducted a similar review, and concurred in that assessment (R. 178).

On January 17, 2002, Ms. Pickett sought an assessment of her mental state at Mid-South Health Systems, and had an interview with a social worker there, Barbara Weaver (R. 221-24). Ms. Pickett reported that she had experienced depressive symptoms since 1993, including depressed mood; crying spells; decreased sleep, appetite, and energy; hopelessness; and anhedonia (*Id.*). The symptoms had become worse since she had been diagnosed with carpal tunnel syndrome (*Id.*).

---

[4]The thenar is the mound on the palm at the base of the thumb. DORLAND'S, at 1696.

According to Ms. Pickett, that condition had precipitated the loss of her job due to "improper medical leave" (R. 224). Ms. Pickett stated she had thought about suicide a week prior to the assessment, and had been hearing voices in her head arguing as to whether she should kill herself (R. 221). Ms. Pickett related that she had been a marijuana and cocaine user in the past, but had not used any in the last eight years after going through rehabilitation (R. 222). Ms. Weaver's impression was that Ms. Pickett had a major recurrent depressive disorder and a mild anxiety disorder, and that malingering needed to be ruled out (*Id.*). Ms. Pickett was admitted as an outpatient on a voluntary basis for a course of individual therapy sessions (*Id.*).

Ms. Pickett had a session with a psychiatrist, Dr. David Erby, on February 11, 2002 (R. 216-217). Dr. Erby noted Ms. Pickett had a ten-year history of depression but had not previously sought treatment (R. 216). Dr. Erby stated the timing of Ms. Pickett's request for treatment might be related to her "unsuccessful quest to obtain disability" (*Id.*). Ms. Pickett exhibited good grooming and hygiene, and a serious, business-like affect (*Id.*). While her mood was depressive and anxious, there was no overt anxiety behavior and Ms. Pickett was not suicidal (*Id.*). Dr. Erby diagnosed major depression, anxiety disorder, not otherwise specified, and noted a need to rule out malingering (R. 217). He assigned Ms. Pickett a Global Assessment of Functioning ("GAF") score of 57 (*Id.*).[5] He started her on a prescription for Celexa for depression, and Remeron as a sleep aid (*Id.*).

At her next therapy session with Ms. Weaver, on February 15, 2002, Ms. Pickett reported a positive change in her depression and sleep within two days of beginning her medication (R. 215).

---

[5]The GAF score is a subjective determination, on a scale of 100 to 1, of the clinician's judgment of an individual's overall level of psychological, social, and occupational functioning. American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders* (DSM-IV-TR) at 32 (rev. 4th ed. 2000). A GAF score of 51 to 60 is intended to identify an individual with "[m]oderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co- workers)." *Id.* at 34.

Ms. Weaver noted that Ms. Pickett was laughing and smiling (*Id.*). On March 11, 2002, Dr. Erby substituted Zoloft for Celexa, due to side effects Ms. Pickett reported (R. 214). It would appear that Ms. Pickett continued her therapy until May of 2002, when she "dropped out" (R. 209). She was officially discharged as an outpatient on July 16, 2002, at which time Ms. Weaver indicated that the initial goal of decreasing depression and anxiety was only "partially met" (R. 207-08).

On February 13, 2002, Ms. Pickett returned to Dr. Marvel with complaints of tenderness in the skin of her left hand and pain in both hands (R. 180). Although Ms. Pickett claimed that the carpal tunnel had returned, Dr. Marvel was skeptical, especially since she had not been working or overusing her hands (*Id.*). There was good functioning in the thenar muscles, and Dr. Marvel could not see much swelling (*Id.*). He ordered an arthritis screen (*Id.*).

Ms. Pickett went to the emergency room on December 19, 2002, for treatment of pharyngeal irritation (R. 242-44). She was given a mask to wear around dust (R. 244). On January 7, 2003, Ms. Pickett went to the Jonesboro, Arkansas Health Center, after inhaling dust while working as a janitor (R. 204). Shortly thereafter, on January 15, Ms. Pickett underwent pulmonary function testing at St. Bernard's Medical Center in Jonesboro, with normal results (R. 258-62). Ms. Pickett also underwent a nerve conduction study at that time (R. 251). The study showed very mild carpal tunnel syndrome in both wrists, with no evidence of radiculopathy or ulnar neuropathy (*Id.*). The study was characterized as essentially unchanged from the study Ms. Pickett underwent prior to her surgeries. (*Id.*).

On February 12, 2003, Ms. Pickett underwent an overnight polysomnogram sleep study, and was diagnosed with significant sleep apnea (R. 247). She also had a CT scan of her chest at that time, which ruled out pulmonary embolus, but was indicative of underlying chronic obstructive

pulmonary disease (*Id.*). A second sleep study was performed on February 25, 2003, and Ms. Pickett was fitted with a continuous positive airway pressure nasal unit for treatment (R. 254). As of March 28, 2003, shortly before her administrative hearing, Ms. Pickett reported that she was taking the following prescription medication: Naproxen for wrist pain, Celebrex for pain, Zoloft for depression and anxiety, and Remeron for sleep (R. 126). She was also using an Azmacort inhaler for shortness of breath (*Id.*).

## B.

At the administrative hearing, Ms. Pickett appeared and testified, represented by counsel. She stated that she had been unable to work since developing carpal tunnel syndrome (R. 47). According to Ms. Pickett, shortly after her surgeries, she was terminated from her job at the greeting card company because she did not have the proper medical leave documentation from her doctor (R. 66). Ms. Pickett felt her hands became worse after surgery (R. 69). She said that she had tried to work on a few occasions since then, but had been unable to last much more than a week (R. 44-45). Ms. Pickett testified that she continues to suffer pain, swelling, and a lack of strength in both hands (R. 67-68). Ms. Pickett admitted to having a drug problem in the past, but explained that she had completed a rehabilitation program and has been clean for ten years (R. 49). She said she smoked about a pack of cigarettes a week, and is trying to quit (R. 51).

Most of Ms. Pickett's activities in a normal day – combing her hair, bathing, dressing, ironing – are adversely affected by her carpal tunnel syndrome (R. 54). She stated that she is unable to sweep, mop, vacuum, wash windows, or wash her car due to the pain and swelling in her hands and wrists (R. 55). She testified that she is able to drive a car, however, and sometimes drives about fifty miles a week (R. 52). As for hobbies, she formerly enjoyed going to the casino, but no longer had

the money to do so (*Id.*). According to Ms. Pickett, she could not sit for very long, because it seemed to affect her breathing: "to cut off [her] airway and [she would] have to get up" (R. 56). She thought she would only be able to walk a block, and would not be able to stand very long (*Id.*). She testified that she was unable to lift or carry things, or push and pull (R. 57). Ms. Pickett stated that she became short of breath easily, such as when she cleaned the house or played with her children (R. 60). She also claimed to have pain in her knees, especially when she stooped (R. 62). She said the medications she took caused side effects, including nausea, drowsiness, and headaches (R. 53).

Ms. Pickett stated that she is irritable and withdrawn (R. 54). She explained that she no longer goes to church because she prefers to be alone (R. 63). She has a poor memory and a short attention span (R. 58). At times, she breaks down and cries (*Id.*). She is worried a lot, and has difficulty sleeping (R. 63). In addition, Ms. Pickett stated she had sleep apnea, and had to sleep with the aid of a "machine" (R. 64).

The VE testified after Ms. Pickett, and asked her some questions regarding her past work. Ms. Pickett explained that she had worked in several departments at the greeting card factory (R. 70). She processed returned orders of cards, which required her to lift twenty-five pound boxes (*Id.*). She also drove a forklift, and worked in the packaging department, which involved pulling orders and folding display trays (*Id.*). Ms. Pickett also described her nurse's assistant position as involving interaction with patients, but no lifting (R. 71-72). The VE characterized Ms. Pickett's nurse's assistant work as semiskilled, and of a light exertional level (R. 72). The greeting card factory jobs involved varied demands. According to the VE, the packaging job was unskilled, light work; the forklift job was semiskilled, light work; and the returned goods job was unskilled, medium work (*Id.*).

The ALJ then asked the VE to consider two hypothetical individuals of the same age, education, and work background as Ms. Pickett, but of differing capacities for work, and provide an opinion as to whether they could perform any of Ms. Pickett's past relevant work. *First,* the ALJ asked the VE to assume such an individual had the capacity to perform light work, but had to avoid temperature extremes, humidity, wetness, dust, fumes, and chemical odors (R. 72-73). Based on that set of limitations, the VE opined such an individual could perform Ms. Pickett's past relevant work as a nurse's assistant and the job in the packaging department (R. 73). *Second,* the ALJ asked the VE to consider that same individual, but with a capacity further limited to sedentary work, and who was unable to push and pull with the upper or lower extremities, kneel, crouch, climb, balance, crawl, stoop, or frequently handle or finger objects (*Id.*). In that instance, the VE testified that such an individual would be unable to perform any of Ms. Pickett's past relevant work (*Id.*). In addition, the VE stated that such an individual would be unable to perform any other jobs that existed in significant numbers in the economy, explaining that sedentary positions would require frequent handling and fingering of objects (*Id.*).

## C.

The ALJ issued her decision on October 24, 2003 (R. 14-20). She applied the standard five-step sequential evaluation pursuant to 20 C.F.R. §§ 404.1520 and 416.920 (2002). At Step 1, the ALJ found that Ms. Pickett had not engaged in substantial gainful activity since January 24, 2001 (R. 15). While there was some evidence of earnings after that date, these amounts were of a level that represented unsuccessful work attempts (*Id.*). At Step 2, the ALJ found that Ms. Pickett had several impairments, which the ALJ at different times described as "significant" and "severe":

bilateral carpal tunnel syndrome, chronic obstructive pulmonary disease, obesity, joint pain, and depression and anxiety (R. 15, 19).

The next stage of the five-step evaluation, Step 3, calls for the ALJ to determine whether a claimant's condition meets or equals an impairment listed in the Agency's regulations as so severe as to preclude substantial gainful activity. Here, the ALJ indicated that Ms. Pickett's excessive weight exacerbated her shortness of breath and joint pain (R. 15). The ALJ found that, although Ms. Pickett had undergone bilateral carpal tunnel release, there was no evidence in the record of a debilitating loss of manual dexterity (*Id.*). Reviewing Ms. Pickett's pulmonary function studies, the ALJ noted that her forced expiratory volume was 83% of the predicted level, which would not indicate a disabling lung condition (*Id.*). The ALJ accepted the fact that Ms. Pickett's medications caused her some nausea and dizziness (R. 16).

Turning to evidence regarding Ms. Pickett's depression and anxiety, the ALJ found that, while Ms. Pickett was assigned a GAF score of 57, indicative of a moderate impairment of functioning, she did not expend good effort during testing, appeared poorly motivated, and tended to shirk work (R. 16). The ALJ also noted that Ms. Pickett had worked for several years despite her depression (*Id.*). Ms. Pickett's mental problems, according to the ALJ, did not meet the "C" criteria of the listing for mental impairments (*Id.*). The ALJ found, instead, that Ms. Pickett's mental impairments resulted in only slight difficulties in social functioning and restrictions in daily activities, no deficiencies of concentration, persistence, or pace, and no extended episodes of decompensation (*Id.*). The ALJ concluded that Ms. Pickett's mental impairments had no more than a minimal effect on her ability to work (*Id.*). The ALJ then determined that the record failed to

establish that any of Ms. Pickett's impairments, either singly or in combination, met or equaled the specifications of an impairment listed as disabling in the Agency regulations. (*Id.*).

At Step 4, the ALJ assessed Ms. Pickett's residual functional capacity ("RFC"), as well as her subjective complaints. While the ALJ acknowledged that Ms. Pickett had limitations, she stated that Ms. Pickett's condition did not preclude all work activity (R. 16). In addition, the ALJ stated that Ms. Pickett exaggerated the extent of her functional loss during her testimony (R. 17). The ALJ noted Ms. Pickett had a history of filing for disability benefits, alleging she had been disabled as long ago as 1987, but had continued to work until January of 2001 (R. 18). The ALJ also discussed Ms. Pickett's sporadic employment history, and her dismissal from her last permanent, full-time job due to improper use of leave, as opposed to any disability (*Id.*).

Turning to Ms. Pickett's RFC, the ALJ noted that two state disability agency physicians reviewed Ms. Pickett's medical record and felt she was capable of medium work (R. 15). Finding Ms. Pickett's capacity for work somewhat more limited, the ALJ concluded that Ms. Pickett had the ability to perform light work, which the Agency regulations define as requiring sitting for a maximum of six hours in a work day, walking or standing for no more than six hours in a work day, and lifting and carrying objects weighing no more than twenty pounds on an occasional basis (R. 18). The ALJ further found that the range of light work Ms. Pickett could perform was "narrowed by her discomfort, shortness of breath, depression, anxiety, and adverse side effects of prescription drugs" (R. 16). However, the ALJ did not describe the manner in which those conditions limited the light duty work which Ms. Pickett could perform (*Id.*).

Finally, the ALJ then considered the VE's testimony that an individual of Ms. Pickett's age, education, and work background, and with an RFC for light work limited by a need to avoid

temperature extremes, dust, fumes, and humidity, would be able to perform Ms. Pickett's past relevant work in the packaging department of the greeting card company or as a nurse's assistant (R. 18). The ALJ "accept[ed] this testimony in its entirety," and concluded that Ms. Pickett retained the capacity to perform her past relevant work and, therefore, was not disabled (R. 18, 20). The hypothetical in which the VE based this testimony did not include any limits based on discomfort, anxiety, depression, and adverse side effects of prescribed medication, all of which the ALJ found limited the work Ms. Pickett could perform.

## II.

To establish a disability under the Act, a claimant must show an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. §§ 423(d)(1)(A)(2002). A claimant must demonstrate that her impairments prevent her from performing not only her past work, but also any other work that exists in significant numbers in the national economy. *See* 42 U.S.C. § 423(d)(2)(A). The Social Security Regulations prescribe a sequential five-part test for determining whether a claimant is disabled. *See* 20 C.F.R. §§ 404.1520; 416.920. Under this test, the ALJ must consider: (1) whether the claimant is presently unemployed; (2) whether the claimant has a severe impairment or combination of impairments; (3) whether the claimant's impairment meets or equals any impairment listed in the regulations as being so severe as to preclude substantial gainful activity; (4) whether the claimant is unable to perform her past relevant work; and (5) whether the claimant is unable to perform any other work existing in significant numbers in the national economy. *See*

20 C.F.R. §§ 404.1520; 416.920; *see also Young v. Sec'y of Health and Human Services*, 957 F.2d 386, 389 (7th Cir.1992).

A finding of disability requires an affirmative answer at either Step 3 or 5. A negative answer at any step other than Step 3 precludes a finding of disability. *Id.* The claimant bears the burden of proof at Steps 1 through 4, after which the burden of proof shifts to the Commissioner at Step 5. *Id.* In cases of severe impairment, the ALJ's analysis at Step 4 typically involves an evaluation of the claimant's residual functional capacity to perform the past relevant employment. *See* 20 C.F.R. §§ 404.1520(e); 416.920(e). If a person can still do this kind of work, the Commissioner will find that the person is not disabled. *Id.* The Step 5 analysis involves an evaluation of the claimant's residual functional capacity to perform any other work that exists in significant numbers in the national economy (other than the relevant past employment). *See Bowen v. Yuckert*, 482 U.S. 137, 142, 107 S.Ct. 2287, 96 L.Ed.2d 119 (1987); 20 C.F.R. §§ 404.1520(f); 416.920(f).

In reviewing the Commissioner's (here the ALJ's) decision, this Court may not decide facts anew, reweigh the evidence, or substitute its own judgment for that of the Commissioner. *Herron v. Shalala*, 19 F.3d 329, 333 (7th Cir.1994). The Court must accept the findings of fact that are supported by "substantial evidence," 42 U.S.C. § 405(g) (2002), which is defined as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Herron*, 19 F.3d at 333 (quotations omitted). Where conflicting evidence allows reasonable minds to differ, the responsibility for determining whether a claimant is disabled falls upon the Commissioner (or the ALJ), not the courts. *See Herr v. Sullivan*, 912 F.2d 178, 181 (7th Cir.1990). *See also Stuckey v. Sullivan*, 881 F.2d 506, 509 (7th Cir.1989) (the ALJ has the authority to assess medical evidence and give greater weight to that which the ALJ finds more credible). The Court is limited to determining

whether the Commissioner's final decision is supported by substantial evidence and based upon proper legal criteria. *Ehrhart v. Sec'y of Health and Human Services*, 969 F.2d 534, 538 (7th Cir.1992). A finding may be supported by substantial evidence even if a reviewing court might have reached a different conclusion. *See Delgado v. Bowen*, 782 F.2d 79, 83 (7th Cir.1986) (per curiam).

The Commissioner (or ALJ), however, is not entitled to unlimited judicial deference. The ALJ must consider all relevant evidence, and may not select and discuss only that evidence which favors his or her ultimate conclusion. *See Herron*, 19 F.3d at 333. Although the ALJ need not evaluate in writing every piece of evidence in the record, the ALJ's analysis must be articulated at some minimal level and must state the reasons for accepting or rejecting "entire lines of evidence." *Id. See also Young*, 957 F.2d at 393 (ALJ must articulate reason for rejecting evidence "within reasonable limits" if there is to be meaningful appellate review). The written decision must provide a "logical bridge from the evidence to [the] conclusion" that allows the reviewing court a "glimpse into the reasoning behind [the] decision to deny benefits." *Zurawski v. Halter*, 245 F.3d 881, 887, 889 (7th Cir.2001) (*quoting Clifford v. Apfel*, 227 F.3d 863, 872 (7th Cir.2000)). This is especially true regarding credibility determinations, since both the case law and the regulations require an ALJ to minimally articulate the specific reasons for the credibility finding. *Zurawski*, 245 F.3d at 887. Specific reasons are required so that the reviewing court can ultimately assess whether the ALJ's determination was supported by substantial evidence or, if not, was "patently wrong." *Id.* (*quoting Powers v. Apfel*, 207 F.3d 431, 435 (7th Cir.2000)).

### III.

Ms. Pickett challenges the ALJ's finding at Step 4 that she can return to her past relevant work. More specifically, Ms. Pickett contends that the ALJ's RFC determination failed to include

all of the limitations on her ability to work that the record supported, and that the ALJ discredited her subjective complaints for factually and legally insufficient reasons.

### A.

Ms. Pickett finds fault with certain aspects of the ALJ's RFC determination, but the most significant would seem to be the ALJ's varying assessment of the additional restrictions that adversely affect her capacity for light work (*Memorandum in Support of Plaintiff's Motion for Summary Judgment*, at 10-11). In the body of her decision, the ALJ initially concluded that Ms. Pickett could perform a range of light work that was narrowed by her discomfort, shortness of breath, depression, anxiety, and adverse side effects of her prescription medication (R. 16). Later on in her decision, the ALJ determined that Ms. Pickett could perform light work (R. 18). Then, echoing the first hypothetical she posed to the VE at the administrative hearing, the ALJ found Ms. Pickett had a capacity for light work that was further narrowed only by her chronic obstructive pulmonary disease (R. 18). As such, the ALJ found Ms. Pickett's only additional limitations were environmental: no temperature extremes, fumes, dust, or humidity (R. 18). Finally, in her findings and conclusions at the close of her opinion, the ALJ simply found Ms. Pickett could perform light work and made no mention of any additional restrictions (R. 19). These shifting and conflicting assessments of Ms. Pickett's RFC fall far short of providing the "logical bridge" that would explain – and allow the Court to meaningfully review – the ALJ's path from the evidence to her ultimate conclusion.

We cannot agree with the Commissioner's claim that this defect in the ALJ's opinion is merely formalistic (*Defendant's Motion for Summary Judgment*, at 9). The Court realizes that it should give a "commonsensical reading" to the ALJ's opinion that does not engage in "nitpicking."

*Johnson v. Apfel*, 189 F.3d 561, 564 (7th Cir. 1999). But rejecting an opinion that expresses an RFC in inconsistent ways is far from nitpicking: it is a recognition that the opinion contains internal contradictions that are fatal to meaningful review. *Shramek v. Apfel*, 226 F.3d 809, 811 (7th Cir. 2000).[6]

## 1.

In order to allow for a meaningful review, as already noted, the ALJ must provide the court with an articulation of her analysis that allows a glimpse into her reasoning. *Zurawski*, 245 F.3d at 888-89. Here, the Court is faced with three varying findings as to Ms. Pickett's RFC. The Commissioner, reasoning backwards from the ALJ's ultimate conclusion that Ms. Pickett is not disabled, suggests that it is obvious which finding represents the ALJ's "true" conclusion: that Ms. Pickett can perform a range of light work narrowed by restrictions due to chronic obstructive pulmonary disease, but not by any other conditions. The fact remains, however, that the ALJ also concluded, earlier in the body of her opinion, that the range of light work Ms. Pickett could perform was more limited than that: that her range of work was also limited by discomfort, anxiety, depression, and adverse side effects of prescription medication.

According to the Commissioner, the ALJ's more expansive statement as to the limits on Ms. Pickett's ability to work was merely a "comment" acknowledging that Ms. Pickett suffered from a

---

[6]The Commissioner's reliance on *Orlando v. Heckler*, 776 F.2d. 209 (7th Cir. 1985) (*Defendant's Motion for Summary Judgment*, at 9), is misplaced. In *Orlando*, the court noted that it would aid review if the ALJ's determinations and supporting reasoning appeared in the findings section, but refused to make it a requirement, focusing instead on the ALJ's "opinion as a whole." *Orlando*, 776 F.2d at 213. The problem in this case, however, goes beyond the ALJ's failure to mention in her findings section that Ms. Pickett's capacity for light work was restricted. The problem is that the ALJ's opinion includes three different assessments of Ms. Pickett's capacity for work: light work with no mention of restrictions, light work restricted only by Ms. Pickett's breathing problems, and light work restricted by each of Ms. Pickett's impairments. This is the "opinion as a whole" that, under *Orlando*, must be the focus of review. And, as we have explained, it is the ALJ's conflicting assessments in her opinion that preclude meaningful review here.

combination of impairments (*Defendant's Motion for Summary Judgment*, at 13). In support of this characterization, the Commissioner cites *Sims v. Barnhart*, 309 F.3d 424, 432 (7th Cir. 2002), which counsels ALJs against focusing on isolated impairments when the record shows that they have some combined effect. However, *Sims* fails to advance the Commissioner's argument, because that argument simply cannot be squared with the language of the ALJ's opinion:

> In this case, the administrative law judge also concludes, however, that even though Ms. Pickett has limitations, her condition does not preclude all work activity. After examination of the claimant at the hearing, *the undersigned also concludes she can do light work activity, but the range of light work that she can do is narrowed by her discomfort, shortness of breath, depression, anxiety, and adverse side effects of her prescribed drugs* (Exhibit 11F).[7]

(R. 16) (emphasis added). This passage is not simply a "comment" or a mere catalog of Ms. Pickett's impairments: it is a "conclusion" reached by the ALJ. And, it is a conclusion that is contradicted – without explanation or analysis – by the ALJ's later RFC finding which indicated that only one of Ms. Pickett's impairments, her shortness of breath, limited her capacity for light work. Having rendered one conclusion as to Ms. Pickett's RFC, the ALJ then abandoned it without explanation. If the law requires the ALJ to state the reasons for rejecting an entire line of evidence, *Herron*, 19 F.3d at 333, certainly the ALJ must give the Court some inkling into how she selected between two conclusions she found supported by the record. Here, the ALJ has failed to do so.

### 2.

The Commissioner points to the evidence in the record to support a finding that Ms. Pickett's capacity for light work was limited only by her chronic obstructive pulmonary disease and was unaffected by her carpal tunnel syndrome, depressive disorder, or other impairments. But, there is

---

[7]Exhibit 11F is nineteen pages of progress notes covering Ms. Pickett's course of evaluation and therapy at Mid-South Health Systems for her depression and anxiety. (R. 2, 206-24)

also evidence in the record to support the ALJ's conclusion that Ms. Pickett's capacity for light work was restricted by these other impairments.

For example, following her carpal tunnel surgeries, Ms. Pickett was apparently experiencing symptoms related to her ulnar nerve, for which Dr. Marvel thought yet another surgery might be appropriate (R. 158, 181). Approximately two years after her surgeries, she underwent a nerve conduction study which, although interpreted as demonstrating only mild carpal tunnel syndrome, was also characterized as unchanged from the nerve conduction study that prompted her surgeries in the first place (R. 251). While the ALJ found, at one point, that Ms. Pickett's carpal tunnel syndrome did not result in a debilitating loss in bimanual dexterity, that is not the same as finding it had no effect on her ability to manipulate. There is a range of degree of loss of manual dexterity short of debilitating that nevertheless might preclude work requiring repetitive manipulation, such as folding and packaging greeting cards.

Regarding the effects of Ms. Pickett's depression, Dr. Erby, her treating psychiatrist, assigned her a GAF score that was consistent with moderate difficulty in occupational functioning,[8] and diagnosed a major depressive disorder (R. 217). The ALJ's initial RFC assessment suggests that she accepted this type of evidence as supporting the existence of restrictions that narrowed the range of light work Ms. Pickett could perform.

---

[8]The ALJ described Ms. Pickett's GAF score as "test results [that were] not valid," explaining that Ms. Pickett did not expend a good effort during the testing (R. 16). The GAF score, however, is not the result of a test, but is, as noted earlier, a number representative of the clinician's assessment of the individual's level of functioning. The score to which the ALJ refers was the product of Dr. Erby's interview with Ms. Pickett on February 11, 2002 (R. 216-17). His report suggests neither that any testing was performed, nor that there was any lack of effort on Ms. Pickett's part during the interview (*Id.*).

In *Henderson v. Barnhart*, 349 F.3d 434 (7th Cir. 2003), the ALJ accepted that the claimant was incapable of safely using hazardous machinery, but later found that he could return to his previous work as a school bus driver or a medical courier driver, without discussing how the hazardous machinery limitation might affect his ability to work in those occupations. 349 F.3d at 436. The Seventh Circuit found that the ALJ had failed to build a logical bridge between the record and his conclusion, and that a remand was therefore necessary. *Id.*

Similarly, once the ALJ in this case concluded that Ms. Pickett could perform light work, but that she suffered additional restrictions due to discomfort, shortness of breath, depression, anxiety, and adverse side effects of prescription drugs, the ALJ never connected this RFC with the issue of whether Ms. Pickett could perform her past relevant work. Neither of the two hypotheticals the ALJ posed to the VE at Ms. Pickett's administrative was a completely accurate reflection of this RFC finding. One was based on a capacity for light work limited only by Ms. Pickett's breathing problems. The other was based on a capacity for sedentary work that was restricted by an inability to push and pull with the upper or lower extremities, kneel, crouch, climb, balance, crawl, stoop, or frequently handle or finger objects. Aside from the capacity for sedentary work, this second hypothetical is the more reflective of the ALJ's initial RFC finding, but the ALJ completely ignored it in her decision.

The fact that the VE testified that an individual with those more severe limitations would be unable to perform Ms. Pickett's past relevant work, or any other work in the national economy, underscores that these three conclusions of the ALJ were more than merely different formulations of the same finding. They are substantively different findings, which can lead to markedly different

answers to the question of whether Ms. Pickett is disabled. The ALJ's decision in this case falls far short of building the required logical bridge from the record to her conclusions. As a result, the Court cannot conduct a meaningful review, and must remand this case to the Commissioner.

**B.**

Because the ALJ's failure to provide a logical bridge from the evidence to the result warrants a remand, the Court need not address Ms. Pickett's concerns regarding the ALJ's credibility finding. Inasmuch as that issue might arise again on remand, however, the Court will briefly address it.

An ALJ's credibility determination generally will not be overturned unless it was "patently wrong." *Powers v. Apfel*, 207 F.3d 431, 435 (7th Cir.2000). In this case, Ms. Pickett calls into question several of the bases the ALJ provided for finding her testimony "only fairly credible"(*Memorandum in Support of Plaintiff's Motion for Summary Judgment*, at 11-13). Initially, she finds fault with the ALJ tying her assessment of Ms. Pickett's credibility to her demeanor at the administrative hearing, arguing that the ALJ applied the disfavored "sit and squirm" test. Indeed, the ALJ noted that, during the administrative hearing, Ms. Pickett's verbal and nonverbal actions did not show that she was experiencing debilitating pain (R. 18). While courts have cautioned ALJs against applying a "sit and squirm" test in their credibility evaluations, they have also endorsed the role of observation in determining credibility. *Powers*, 207 F.3d at 436. As long as the ALJ considers other relevant factors, his or her observations have a place in evaluating a claimant's complaints. *Id.* Here, because the ALJ did consider other factors, her comments on Ms. Pickett's demeanor alone would not necessitate a remand.

Ms. Pickett, however, is also critical of the ALJ's consideration of other factors in assessing her credibility: (1) Ms. Pickett alleged in a previous application that she was disabled as early as

1987, but had engaged in substantial gainful activity thereafter (*Id.*); (2) Ms. Pickett's work record contained periods of unexplained inactivity (*Id.*); (3) Ms. Pickett was dismissed from her last full-time, permanent job because of improper use of medical leave, as opposed to any disability (*Id.*); and (4) the ALJ found inconsistencies between Ms. Pickett's testimony about her pain, and the objective medical evidence and other evidence of record (*Id.*).

With respect to testimony that might be found inconsistent with the medical evidence, the Seventh Circuit has instructed:

> If the allegation of pain is not supported by the objective medical evidence in the file and the claimant indicates that pain is a significant factor of his or her alleged inability to work, then the ALJ must obtain detailed descriptions of claimant's daily activities by directing specific inquiries about the pain and its effects to the claimant. She must investigate all avenues presented that relate to pain, including claimant's prior work record information and observations by treating physicians, examining physicians, and third parties. Factors that must be considered include the nature and intensity of claimant's pain, precipitation and aggravating factors, dosage and effectiveness of any pain medications, other treatment for the relief of pain, functional restrictions, and the claimant's daily activities.

*Luna v. Shalala*, 22 F.3d 687, 691 (7th Cir.1994) (citation omitted). It is not enough for the ALJ to simply recite these factors or make a conclusory statement that the claimant's allegations have been considered. Here, the ALJ acknowledged that these factors must be considered, but did not address all of them specifically.

While the ALJ recited Ms. Pickett's description of her daily activities, she did not discuss them in connection with her credibility determination. As Ms. Pickett described them, her activities were certainly restricted and not of the type to contradict a claim of disabling pain. *See Zurawski*, 245 F.3d at 887. Ms. Pickett's work record and prior unsuccessful applications for benefits seemed to weigh most heavily on the ALJ's mind. Ms. Pickett's work record since 1993 does include a

period of inactivity between 1998 and 2000, and is made up of a series of short-lived, low-paying jobs. While it is appropriate for the ALJ to have considered this, she ought also to have considered whether it was a product of a lack of education, or a lack of job opportunities. *Sarchet*, 78 F.3d 305, 308 (7th Cir. 1996). With regard to Ms. Pickett's termination over improper use of leave, the record suggests that this does involve her alleged disability, insofar as it would appear to be a result of her carpal tunnel syndrome, her surgeries, and her subsequent recovery period. This is a case where the Court is unable to say that the ALJ investigated all avenues that relate to Ms. Pickett's complaints, giving the Court an insufficient basis to sustain the ALJ's credibility determination. *Zurawski*, 245 F.3d at 888. These deficiencies in the ALJ's credibility finding should be kept in mind on remand.

## CONCLUSION

The Commissioner's motion for summary judgment (doc. # 20) is DENIED; the plaintiff's motion for summary judgment (doc. # 18) is GRANTED. The Court reverses and remands this case to the Commissioner for further proceedings consistent with this opinion, pursuant to sentence four of 42 U.S.C. 405(g).

ENTER:

**SIDNEY I. SCHENKIER**
**United States Magistrate Judge**

Dated: July 6, 2004

23